**UNITED STATES of America, Plaintiff,**

v.

**Alfredo BATRES–SANTOLINO, Richard Lancaster, Connie Haydon & Harvey Haydon, Defendants.**

**No. CR–81–0100–MHP.**

United States District Court,
N. D. California.

Aug. 21, 1981.

Margo D. Smith, Asst. U. S. Atty., Crim. Div., San Francisco, Cal., for plaintiff.

Dennis Roberts, Oakland, Cal., Harry Hellerstein, Federal Public Defender, San Francisco, Cal., Penelope Cooper, Howard Hertz and Paul Wellenkamp, Cooper, Newhouse, Hertz & Lyons, Berkeley, Cal., for defendants.

## OPINION

PATEL, District Judge.

■ Defendants have been indicted for conspiracy to import cocaine, and conspiracy to possess it with intent to distribute. The charges arise out of certain transactions with a DEA agent and a DEA informant in Quito, Ecuador. Defendants argue that the informant induced them to enter into the conspiracy, and they have moved to dismiss the indictment on the ground that it was obtained by virtue of outrageous government conduct amounting to a violation of due process. This motion raises an issue of law for the court, *United States v. Wylie,* 625 F.2d 1371, 1378 (9th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981), and is properly raised by a pretrial motion to dismiss the indictment. Fed.R.Crim.P. 12(b). *See United States v. Nunez-Rios,* 622 F.2d 1093, 1098 (2d Cir. 1980).

Defendants submitted declarations and affidavits setting forth their version of the facts; the Government chose not to cross-examine them. The Government submitted declarations of the principal DEA agent involved and of the informant.[1] An evidentiary hearing was held at which defendants' counsel cross-examined both these individuals.

On June 4, 1981, after closing argument on the motion, the court indicated from the bench that defendants' motion was granted. A written order to that effect was filed on June 25. The court now issues its findings of fact, Fed.R.Crim.P. 12(e), along with a discussion of the legal issues raised by defendants' motion.

### FINDINGS OF FACT

Bryan R. Thomas, the DEA informant, is a British citizen who has resided in Ecuador for the past nine years. Thomas has no criminal record and is not a regular drug user. He has been involved in a number of different business enterprises while in Ecuador, in which his duties have centered on sales, public relations, and commodities trading. He has also been part owner of a bar or restaurant frequented by the English-speaking community of Quito, Ecuador. Beginning in 1972, as a result of his ownership of this bar, Thomas came to know various American Drug Enforcement Agency (DEA) agents stationed in Quito. He became social friends with these agents, and they were more than just customers to him. He also knew what their job involved.

Beginning at least by 1974, Thomas began to inform the DEA agents who were his friends about people who came into his bar and asked about where they could obtain cocaine. In 1975, although Thomas did not know it at the time, the DEA classified him as an official informant. During that year, Thomas performed a surveillance job for the DEA, going to a village at the beach several hundred miles from Quito to report on the number and descriptions of a group of Americans staying at a hotel there. Thomas was paid $153.00 for expenses in connection with this incident. Thomas was quizzed in his testimony as to whether he found this work colorful or interesting. At first he denied that he did, but later admitted that it was "interesting." DEA Agent Joseph Lopez who was familiar with Thomas and his work described it as a novelty for Thomas. Lopez perceived that Thomas derived satisfaction from being able to deliver up the defendants in this case as a result of his informant efforts.

From 1974 to 1980 Thomas continued to provide information to DEA on a sporadic basis. He initiated calls to DEA agents in Quito about inquiries concerning cocaine that were made by visitors to his bar and on two occasions in 1977, he received cash payments "for expenses," in the neighborhood of $300.00 each time, in exchange for information he furnished to the DEA. In June of 1979, although Thomas remained in casual contact with Quito DEA agents, he was officially placed on inactive status as an informant.

He remained on inactive status until January 1981. He was reactivated in late February following events in Quito to be described below. By the date of the evidentiary hearing, Thomas had received informant expenses payments totalling $1,125.00, and a reward of $2,000.00, in connection with his role in the instant case.

The above background facts are substantially undisputed. As to the remaining facts to be described, certain of them are in sharp dispute; the narrative below embodies the court's findings as to those disputed facts. In resolving those disputes, the court has kept in mind that Bryan Thomas' credibility was successfully called into serious question by defense counsel. Thomas' repeated, clear assertion that he had not read defendants' declarations before preparing his own was shown to be inherently incredi-

---

1. Before the initial argument on the motion, the Government submitted only a declaration, primarily consisting of hearsay, by a different DEA agent. Defendants moved to strike this declaration. This motion is hereby denied as moot, because the court has not considered that declaration in making its findings.

ble, and was contradicted by the testimony of DEA Agent Lopez, whom the court found to be a far more credible witness. Thomas' testimony in other respects was misleading or evasive, or later had to be retracted. Agent Lopez also contradicted Thomas' version of the facts in several respects.

A particularly illuminating exchange occurred when Thomas was examined regarding his declaration made under penalty of perjury and filed in opposition to defendants' motions to dismiss. In the declaration at paragraph 19 he stated:

"I never told either one of them that I had a 'pressing need' for money nor that I wanted to 'invest' in the importation of guns."

On cross-examination Thomas recounted his preparation of the declaration with the assistant United States attorney:

"Q. ... You were just telling her [U.S. Attorney] generally all the things that went on, and one of the things you said that went on was that 'I did not say anything about investing in guns,' right?

"A. That's correct."

R.T. at 99, 11s. 24 to p. 100, 1.2.

On further examination Thomas' story wavered.

"Q. All right.

Now, are you saying, sir, that you never discussed any kind of armaments business, never discussed any kind of armaments business with Mr. Lancaster any time—

"A. No, I did discuss the armaments business with him.

"Q. You did?

"A. Yes.

"Q. You simply never used the phrase 'invest in the importation of guns.'

"A. Exactly.

"Q. I see.

You used other words regarding the importation of guns.

"A. I asked him—I was talking. He asked me what I did and I said I represented many companies, amongst those,

machine guns, things like that, the sale of machine guns, weapons—and weapons, clothing and things, military—military supplies.

"Q. Right.

"A. Uh-huh.

And then he said that he could—he had a very good friend who had connections to get a certain type of machine gun in Ecuador in the States.

And he said, 'Why don't you phone him? They're asking for a quotation now.'

"Q. Okay.

As a matter of fact, you gave him the specifics of the Ecuadorian quotation—that is to say, the Ecuadorian purchase order—is that not correct?

"A. Yes.

"Q. You gave him a great deal of specifics regarding the armaments business, isn't that correct?

"A. That's correct.

"Q. And you told him that you and he would work together in the business of import—importing and these are legal arms to Ecuador, isn't that correct?

"A. In these specifics, yes, within these specifics.

"Q. Excuse me?

"A. In these specifics, yes, within these specifics.

"Q. The specifics that—

"A. Not in my other business.

"Q. No, no. Within the specifics set forth in the Lancaster affidavit.

"A. Yes.

"Q. And you said that you and he would engage in a partnership to do this, isn't that correct?

"A. It—it's a normal thing, yes.

"Q. Yes or no?

"A. Yes."

At times Thomas' testimony appeared to take on the character of the work that he has done for much of his life. It sounded like the puffing talk of a salesman accustomed to using generalities and overstatement. When he was pinned down he began to equivocate and was unable to substanti-

ate or had to qualify many of his statements. Thus, the court has given little weight to much of Thomas' testimony.

On October 18, 1980, Thomas paid a visit to the home of a friend and business associate, Robert Forbes, in Atlanta, Georgia. At Forbes's home, he met defendant Batres-Santolino (Batres), and another man named Aguilar. According to Batres's declaration, Thomas was the first person to raise the subject of cocaine; according to Thomas, Aguilar and Batres raised the subject, and talked of little else from shortly after Thomas' arrival. The truth is probably somewhere in between; in any event, the crucial facts for the purpose of this motion are that Thomas, on his own initiative, represented to Batres that he had a cocaine source in Houston and that he had dealt cocaine, and offered to supply Batres with cocaine in substantial quantities. (Thomas' intent was to call his friend DEA Agent Kuykendall, whom he knew to be in Texas, and have him pose as the Houston "source.") Batres then told Thomas that he had been planning to visit Guatemala and Colombia, in part to see family, and that he might visit Thomas in Ecuador as well. During that Atlanta visit, Thomas claims he ingested cocaine for his first and only time.

Upon Thomas' return to Quito after the Atlanta incident, he notified DEA Agent Lard of what had happened. The DEA did not expect anything to come of Thomas' contact with Batres. However, in November, Thomas received a telephone call from Batres saying he would be arriving in Quito in two days. Thomas called Agent Lard and was instructed that if Batres showed up, he should introduce him to an Ecuadorian narcotics agent, part of a special team of agents whom the DEA had recently trained. Although Thomas testified that he was emotionally indifferent, and denied he had any motive for becoming involved in this incident other than friendship for DEA agents and dislike of the drug business, Agent Lopez testified, and the court finds, that Thomas later appeared "enthused" about his participation and derived emotional satisfaction from it.

Batres and defendant Connie Haydon met Thomas in Quito in early November. He introduced them to the Ecuadorian agent who posed as a drug dealer. During this visit, Connie Haydon told Thomas that she had never been involved in drug dealing before. No cocaine was actually sold or used during this visit. Thomas told Batres and Haydon that he had friends in the DEA, whom he pointed out in his bar, and gave the impression of being a prominent, well-known figure in Quito.

Connie Haydon and Batres met with the Ecuadorian agent several times. Prices and quantities of cocaine were discussed, but no final arrangement for a sale was made at least in part because defendants did not have the money and were not sure whether or how they could get it. At the time defendants left Quito, they had no definite plans either to carry through with the transaction or not to do so. The DEA agents themselves did not think that anything would come of defendants' visit, and in fact, put Thomas' informant file in a "closed" status in January 1981.

The DEA had instructed Thomas to make a written statement after any contacts with defendants, and to let them know the substance of any telephone conversations with them. Despite these instructions, Thomas gave no written statement to the DEA until well after Connie Haydon's later visit to Quito with defendant Lancaster in February 1981. However, Thomas did report to the DEA informally. Although Thomas denied doing so, Agent Lopez testified that Thomas told him that Connie Haydon had said that she had never been involved in dealing drugs before.

In his testimony, Thomas claimed to have had second thoughts at this point about getting involved. The court does not credit this testimony, because Thomas admitted that he did not report these doubts to the agents, yet (according to Agent Lopez) the agents themselves cautioned Thomas to think carefully about proceeding further.

In late November or December, Thomas called Batres to ask him about the progress of the deal. Batres told Connie Haydon

about the call. (Thomas denied making the call, but the court adopts defendants' version of this fact.) Connie Haydon then called Thomas, but apparently did not reach him. He called for her several times, and at least some of the time these calls were prompted by messages from her. One call was made in Agent Lopez' presence from the DEA office in Quito, but Connie was not available for that call and her mother took a message. In a late January call, not made in Agent Lopez' presence, Thomas stated to Connie that the "big man" was holding him responsible for the delay. Thomas' intent in making this statement was to encourage defendants to set a definite date in the near future for their return to Quito to make arrangements for a cocaine sale.

In mid-February, Connie Haydon and defendant Richard Lancaster came to Quito. They brought with them two books on cocaine, some bottles for testing for cocaine, and a cashier's check for $210,000. Thomas was to introduce them to the "big man," in reality DEA Agent Lopez posing as a cocaine exporter.

Before their meeting with Lopez, however, Lancaster and Haydon spent at least four hours with Thomas. During that time, there were discussions about how the two Americans were to present themselves to the "big man," and about possible legitimate, extraordinarily profitable armaments and grain deals in which Lancaster and Thomas could be partners, and in which the proceeds of the cocaine transaction could be invested and "laundered." In furtherance of the proposed legitimate deals, Thomas introduced Lancaster to his Ecuadorian lawyer and to a banker, and Lancaster was persuaded to call a friend who was a licensed armaments dealer in the United States in order to obtain price and delivery quotations on guns and various forms of grain.

Thomas represented himself to defendants as highly knowledgeable and well-connected with respect to the Ecuadorian government. He had contacts in the presidency, the ministry of defense, and the ministry of agriculture. From the latter, he could obtain secret details about competitive bids, so that he and Lancaster could make a fortune on various grain sales to the Ecuadorian government.[2] When Lancaster found out from his American friend that the grain requirements could not be filled, Thomas chided him for acting too slowly.

Lancaster was in financial trouble, and had no source of capital for investing in the armaments and grain deals other than the proceeds of the potential cocaine venture. Thus, the vast profits Thomas was proposing were necessarily conditioned on Lancaster's willingness to go through with the cocaine conspiracy. Thomas did not inform the DEA that he was discussing these legitimate business ventures with Lancaster.

Defendant Lancaster told Thomas that he had dealt cocaine on a small scale before, but that he had never handled large quantities and had never imported it. Thomas cautioned defendants that the "big man" was not easily impressed and was not accustomed to dealing with amateurs or small-scale dealers, and was only willing to meet with them because of their connection with Thomas. He encouraged them to represent themselves to Lopez as experienced, large scale dealers. (Although Thomas denied it, Agent Lopez testified that Thomas knew the DEA was only interested in Thomas' help if he could put together something big or substantial.)

At the meeting with Lopez, Lancaster attempted to show his purported expertise in the cocaine business by handing Lopez a formula for converting coca paste into cocaine hydrochloride, the form in which it is imported into the United States. Lopez testified that this display was ludicrous, and that he realized that Lancaster was not the experienced dealer he purported to be. In fact, Lopez told Lancaster that he knew he was an amateur, but expressed confidence

---

**2.** Ultimately, there was a scandal concerning the Ecuadorian government's grain purchases, and several persons were imprisoned as a result. Thomas appears to have avoided becoming implicated.

in Lancaster's ability to carry through with the venture anyway. Lancaster asked Lopez for information about how to set up the distribution network in the United States. Defendants' first meeting with Lopez concluded with no definite terms established for price or quantity, and no definite agreement about the deal. No cocaine samples were ever exchanged.

After the first meeting with Lopez, Lancaster expressed fears and second thoughts to Thomas. Defendants had torn the $120,000 cashier's check in half and given half of it to Lopez; they were concerned that they might lose their money. Thomas did not want Lancaster and Haydon to back out; he wanted to deliver a case to his DEA friends. He reassured them, and talked again about the future profits they could make from legitimate business deals using the proceeds of the cocaine venture. Ultimately, defendants did come to an agreement with Lopez at a subsequent meeting.

While making arrangements to pick up the purported cocaine shipment in San Francisco, defendants were arrested and subsequently indicted for conspiracy to import cocaine and to possess it with intent to distribute.

### DISCUSSION AND CONCLUSIONS

The "outrageous government conduct" defense [3] was suggested in the following dictum in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973):

[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. . . .

*Id.* at 431–32, 93 S.Ct. at 1642–1643. The court approved its earlier conclusion in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) that conduct which exceeded permissible bounds was as objectionable as coerced confessions and un-

lawful searches. Prior to *Russell* the Ninth Circuit had adopted a form of the defense in *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). The Ninth Circuit has continued to recognize the defense since *Russell*, and has held explicitly that it survived the plurality's disapproval of it in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). *United States v. Prairie*, 572 F.2d 1316, 1319 & n.3 (9th Cir. 1978).

The defense is distinct from the entrapment defense in that it raises a question of law for the court, *United States v. McQuin*, 612 F.2d 1193, 1196 (9th Cir.), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980), and is available even to a defendant who was "predisposed" to commit the crime and therefore could not claim entrapment. *See United States v. Wylie*, 625 F.2d at 1377. However, the level of government misconduct that must be shown is perhaps higher than for entrapment, and there are few reported cases in which defendants have invoked the defense successfully. *But see, e. g., United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *United States v. Jannotti*, 501 F.Supp. 1182 (E.D. Pa.1980).

*United States v. Russell* itself upheld the convictions there at issue. In so doing, the Court emphasized that defendant and his associates were already engaged in the manufacture and sale of methamphetamine at the time the agent approached them. *See* 411 U.S. at 431–32, 436, 93 S.Ct. at 1645. The agent supplied only one element used in manufacture; defendants provided all other necessary supplies, and had set up and used the laboratory even before the agent agreed to supply the chemical. Finally, as the Court recognized, *id.* at 431, 93 S.Ct. at 1642, the facts showed that the agent's participation had not been necessary to enable defendants to continue their operation; presumably, they were able to obtain the needed chemical independently

---

**3.** Although referred to as a defense in most of the cases cited herein, outrageous government conduct is generally considered to be a due process deprivation and, therefore, more prop-

erly described as a grounds for dismissal. For conciseness the less precise term "defense" is used in this opinion.

of the agent, as they had been able to do so for the manufacture of previous batches of the drug.

The instant case is very different. Defendants here had never imported cocaine before, and had no foreign source of supply of their own whatsoever. As obvious novices, it is inconceivable that they could have entered the secretive world of international drug smuggling on their own. Established drug exporters would have spotted them instantly as amateurs and dismissed their efforts as ludicrous, just as Agent Lopez did.

Admittedly, the Supreme Court in *Russell* declined to apply a rigid "but-for" test for excessive government involvement in the commission of crime, *see* 411 U.S. at 431, 93 S.Ct. at 1642, and approved government undercover infiltration of drug rings. *Id.* at 432, 93 S.Ct. at 1643. But "infiltration" implies that there is an organization to infiltrate. In the instant case, there was no organization until the acts of Bryan Thomas [4] and the DEA persuaded defendants to create one. Rather, this is a case in which government agents "manufactured" a crime that this court concludes could not and would not have been committed if Bryan Thomas had not inveigled defendants into it and offered to provide them with an otherwise unavailable source of supply of the illegal drug they were to import.

Admittedly, it is not a *per se* due process violation to convict a defendant for a drug offense where it was the government that supplied the drug. *Hampton v. United States*, 425 U.S. at 491, 96 S.Ct. at 1650 (Powell, J., concurring); *United States v. Gonzales-Benitez*, 537 F.2d 1051, 1055 (9th Cir.), *cert. denied*, 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976). *Cf. United States v. Rueter*, 536 F.2d 296 (9th Cir. 1976) (agents' promise to supply hashish not entrapment). Nonetheless, which party supplied the drug is relevant and important to assessing the degree of government involvement in setting up the crime.

Just as a defendant's lack of prior criminal involvement is relevant to an entrapment defense, *United States v. Brandon*, 633 F.2d 773, 777–78 (9th Cir. 1980); *see United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 & n.9 (9th Cir. 1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978), so too is it relevant to a claim of outrageous government conduct. In neither case is it dispositive,[5] but it is highly relevant to the issue of whether the defendant or the government should ultimately be held accountable for the instigation of the crime.[6]

---

4. The government, wisely, has not pressed the argument that Thomas was not acting as its agent during his dealings with defendants in Quito. Moreover, this court finds that Thomas' actions in Atlanta may also be attributed to the government. He had a well-established history as a DEA informant, and had been paid in that capacity on several occasions. He was acting for the purpose and with the intent of gathering information for the DEA, and did so in his capacity as an ongoing, though sometimes informal, official informant.

5. In *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), defendants' convictions were reversed on outrageous government conduct grounds even though they had previously been convicted of precisely the same crime.

6. Almost all of the cases rejecting an outrageous government conduct defense involve defendants who have previously been involved in similar crimes, and/or a criminal enterprise that was already in progress at the time government agents became involved. *See, e.*

g., *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Wylie*, 625 F.2d 1371, 1374 (9th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *United States v. Prairie*, 572 F.2d 1316 (9th Cir. 1978); *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1332, 1338–39 (9th Cir. 1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978); *United States v. Gonzales*, 539 F.2d 1238 (9th Cir. 1976); *United States v. Greenbank*, 491 F.2d 184 (9th Cir. 1974). All of these cases are therefore distinguishable on at least that ground.

*United States v. McQuin*, 612 F.2d 1193 (9th Cir.), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980), is also distinguishable for a similar reason. The opinion does not reveal whether McQuin had already formed before McQuin first met with the agents. However, it does state that McQuin had already conceived a detailed, well-developed, professional-sounding plan for the crime before the agents ever met him. Thus, McQuin could not

752

In this case the government does not suggest nor does the record show that defendants had ever been involved in drug smuggling or distribution or that they were ever involved in criminal activity. Even Lancaster and Batres had no criminal records and had never been involved with large scale drug conspiracies. Lancaster had to ask Agent Lopez for tips on how to organize the distribution of the cocaine in the United States. Moreover, no criminal enterprise involving defendants existed until Bryan Thomas' actions prompted them to create one. Finally, the defendants had no organization or ability to smuggle the drugs into the United States. So again, the government obliged them and arranged that part of the enterprise as well.

■ Thus, this is a case in which the government supplied all the drugs *and* defendants were not involved in a drug-related enterprise until the government agent came on the scene. In the only reported case in which both of those factors were present, the court accepted defendants' outrageous government conduct defense. *See United States v. Twigg, supra.*[7]

Here the inducements offered to defendants to enter into and go forward with the conspiracy went far beyond the normal puffery, shows of good faith, or threats that the courts have held to be appropriate tactics in undercover law enforcement operations. In exchange for defendants' agreement to import cocaine, defendant Lancaster was offered a chance to make substantial profits from legitimate business ventures in partnership with a well-connected, prominent figure in Ecuadorian society. Prior cases in which government agents have contributed materials, labor, or planning skills in order to infiltrate a criminal enterprise, or have made threats to recalcitrant coconspirators in order to play out their undercover roles, simply are not comparable. This court recognizes that there are few cases in which the outrageous government conduct challenge has prevailed. There are few cases where the government has so clearly exceeded the bounds of permissible law enforcement conduct. Permissible conduct has been described as that which, even with the use of stealth and subterfuge, is designed to expose illicit traffic, illegal conspiracies, violations or would-be violations of the law and to prevent crime. *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). However, this is not a case where the government is ferreting out ongoing criminal activity. It is a case where the government, through its agent, went about putting persons into the business of crime for the first time.

This is a case of that distinguishable variety posed in *Sherman* and *Russell* where the "criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sherman v. United States*, 356 U.S. at 372, 78 S.Ct. at 820, quoting *Sorrells v. United States*, 287 U.S. at 442, 53 S.Ct. at 212. Although the defendants in this case are not without some culpability, they were not embarked or about to embark on any criminal activity until the government's agents set in motion the operation.

If the Supreme Court's prediction in *Russell* is to have any meaning there must be some minimum level of conduct that triggers its operation. The government has met that level by its actions in this case. Its conduct rises to the level characterized as outrageous government conduct. It violates the due process principles of "fundamental fairness" and shocks "the universal sense of justice." *United States v. Russell*, 411 U.S. at 432, 93 S.Ct. at 1643, citing *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4

claim, as defendants do here, that the idea and expertise for the crime came from government participation.

7. In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), as here, there was some indication that certain of the defendants had been involved with drugs before, *see id.* at 376, but that did not vitiate the outrageous conduct defense.

L.Ed.2d 268 (1960). To hold otherwise would render the promise of *Russell* meaningless.

For all of these reasons, as indicated from the bench and in its previous order, this court finds that the indictment in this case must be dismissed on the ground that it was procured by outrageous government conduct amounting to a violation of due process.