UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert Nelson SAVAGE, Terry Peters,
Dennis Lee Wagner,
Defendants-Appellants.

No. 81–5270.

United States Court of Appeals,
Eleventh Circuit.

March 9, 1983.

Geoffrey C. Fleck, Miami, Fla., for Savage.

Philip Gerson, Miami, Fla., for Peters.

Kurt Marmar, Coral Gables, Fla., for Wagner.

Kenneth W. Lipman, Asst. U.S. Atty., Miami, Fla., Lurana Snow, Asst. U.S. Atty., Fort Lauderdale, Fla., for plaintiff-appellee.

Before TJOFLAT, KRAVITCH and HATCHETT, Circuit Judges.

TJOFLAT, Circuit Judge:

Appellants Savage, Wagner, and Peters were convicted in the district court of conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846 (1976), and of possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1976) and 18 U.S.C. § 2 (1976). Finding no error below, we affirm the convictions of each appellant.

I.

All three appellants urge that the district court erred in denying their motion to dismiss the indictment because of government overreaching in violation of their due process rights. The arrests and subsequent convictions of appellants arose out of a plan the Drug Enforcement Administration (DEA) conceived under which DEA agents posed as sellers of large quantities of marijuana; put the word out through undercover agents and confidential informants that marijuana was available for purchase; and arrested those persons who "purchased" marijuana once the "sale" was consummated. In furtherance of this plan, the DEA rented a warehouse and placed in the warehouse about 10,000 pounds of marijuana that it had seized in a separate operation. The execution of this plan resulted in numerous arrests and convictions, including those of the three appellants.

■ This circuit has recognized that a due process violation may result when the government's enforcement techniques reach a certain level of outrage.[1] *See United States v. Tobias,* 662 F.2d 381 (5th Cir. Unit B 1981).[2] The case law emphasizes the extreme circumstances that must exist before a due process violation will be found: law enforcement techniques will be deemed unconstitutional only if they violate that " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973) (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)). As Justice Powell recognized in his concurring opinion in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976):

> the cases, if any, in which proof of predisposition [of the defendant to commit the crime] is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic, . . . which is one of the major contributing causes of escalating crime in our cities. . . . Enforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity.

425 U.S. at 495 n. 7, 96 S.Ct. at 1653 n. 7 (citations omitted).

---

1. We note at the outset that we are concerned solely with whether the government's conduct violated the due process rights of the appellants. This is a question of law for the court to determine. *United States v. Graves,* 556 F.2d 1319, 1321–23 (5th Cir.1977). We are not concerned with entrapment, which is a question for the trial court factfinder, usually the jury. *Id.* at 1321. Thus, we reject appellant Wagner's argument that the trial court erred in failing to instruct the jury on the defense of government overreaching. Similarly, we reject appellant Savage's argument that the court should have instructed the jury on the defense of entrapment as a matter of law. The Supreme Court case of *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), obliterated that doctrine. *United States v. Rodriguez,* 585 F.2d 1234, 1240 n. 5 (5th Cir.1978).

2. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), we adopted as precedent decisions of the Unit B panel of the Former Fifth Circuit.

Courts have kept the above principles in mind and have been extremely reluctant to strike down government law enforcement techniques as violative of due process. Although "the government may not instigate the criminal activity [by suggesting the establishment of an illegal drug laboratory], provide the place, equipment, supplies and know-how, and run the entire operation with only meager assistance from the defendants without violating fundamental fairness," *United States v. Tobias,* 662 F.2d 381, 386 (5th Cir. Unit B 1981) (citing *United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978)), cases in which the government's conduct has reached such a level are rare.

*United States v. Tobias,* 662 F.2d 381 (5th Cir. Unit B 1981), is a case in which the government's conduct "set the outer limits to which the government may go in the quest to ferret out and prosecute crimes," *id.* at 387, but yet did not rise to that extreme level of outrageousness sufficient to establish a due process violation. In *Tobias* the DEA established a chemical supply company and placed advertisements in *High Times Magazine* to sell various chemicals and equipment used in the manufacture of illegal drugs. Tobias requested and received more information from the company. Tobias then telephoned the company on numerous occasions to order supplies and to check on his orders. Within one month of placing his first order, Tobias called the company to cancel his orders because he had discovered he did not possess the knowledge or the equipment to manufacture cocaine. Before he could cancel his orders, however, a DEA agent asked him what he was trying to do. Tobias admitted his desire to manufacture cocaine and related his difficulties in trying to do so. The agent pretended to sympathize with Tobias, and stated that he too found cocaine difficult to manufacture. In response, Tobias stated that he was not interested in manufacturing cocaine per se, but that he just wanted to make some money. The agent then suggested that a number of drugs were easier to manufacture than cocaine, including amphetamines and phencyclidine (PCP). The agent explained that making PCP was as easy as

"baking a cake" and offered to send Tobias everything he would need to make PCP for $500. Tobias agreed. After receiving the chemicals, Tobias called the company thirteen times for advice on how to make PCP. Tobias was later convicted of conspiring to manufacture and possess PCP with intent to distribute in violation of 21 U.S.C. § 846 (1976), and of manufacturing, and possessing, PCP with intent to distribute, both in violation of 21 U.S.C. § 841(a)(1) (1976).

The above facts arguably portrayed a complete novice who because of lack of ability never could have committed the crimes of which he was convicted without the government's constant guidance. Moreover, it appeared likely that Tobias had given up any intent to manufacture illegal drugs, concluding that it was too difficult, until the government suggested that some drugs could be easily manufactured. "Had the Government agents at any point ceased providing Tobias with assistance and encouragement, the record indicates that he would have been incapable of manufacturing the illicit drug. Thus, Government agents vicariously manufactured PCP through Tobias ...." *Tobias,* 662 F.2d at 392 (opinion of Johnson, Circuit Judge, dissenting). *Tobias* thus illustrates the extreme narrowness of the defense of government overreaching.

We believe the instant case falls far short of the extremely outrageous and shocking conduct necessary to establish a due process violation. The appellants argue that the government "created" the crimes in this case by soliciting citizens to participate in an illegal venture. The government in no sense created the crimes because it merely presented the appellants with an opportunity that was in no way unique, of which the appellants were more than willing to take advantage. For example, it is useful to contrast this case with *United States v. Batres-Santolino,* 521 F.Supp. 744 (N.D.Cal.1981). In that case, the government created the crimes for which the defendants were convicted because the government presented the defendants with a unique opportunity that otherwise would

not have arisen: "As obvious novices, it is inconceivable that [the defendants] could have entered the secretive world of international drug smuggling on their own. Established drug exporters would have spotted them instantly as amateurs and dismissed their efforts as ludicrous . . . ." *Id.* at 751. The court concluded that "government agents 'manufactured' a crime that . . . could not and would not have been committed if [the DEA informant] had not inveigled defendants into it and offered to provide them with an otherwise unavailable source of supply of the illegal drug they were to import." *Id.* Unlike the situation in *Batres-Santolino,* the government in this case merely provided the appellants with an opportunity not substantially different from that which they could have found elsewhere without undue difficulty. Moreover, the appellants do not, and cannot, contend that the government targeted them beforehand for arrest. Appellants were merely caught in the trap the government set for those who were willing to take the bait. We find nothing outrageous in the government's activity.

## II.

Two of the three appellants, Savage and Peters, were arrested as they drove away from the marijuana warehouse in an automobile. Savage was the driver and Peters was a passenger in the back seat. After arresting Savage, Peters, and another occupant of the automobile, DEA agents drove the automobile to a "drop-off" point and conducted an inventory of its contents. This inventory revealed a gym bag in the trunk containing approximately $50,000. Savage and Peters moved to suppress this money, but the district court adopted the magistrate's recommendation to deny the motion and admitted the evidence at trial.

■ Savage argues, and Peters adopts this argument, that the evidence should have been suppressed because it was obtained in violation of the fourth amendment. The district court ordered both Savage and Peters to attend a suppression hearing if either believed his fourth amendment rights had been violated. Neither Savage nor Peters attended the hearing. Nevertheless, the court allowed their counsel to participate in the proceeding subject to the court's receipt of affidavits from the defendants describing their interest in the seized money. Neither Savage nor Peters ever filed the proper affidavit.

Without knowing what claim Savage or Peters had to the money or even their interest in the automobile, the district court could not determine whether any violation of their fourth amendment rights had occurred. *See United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (defendant must have a legitimate expectation of privacy in the area searched to assert a fourth amendment violation); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Under these circumstances, the district court had no choice but to find no violation of Savage's or Peters' fourth amendment rights. Thus, this argument fails.

## III.

■ On the second day of trial, the court announced that a magazine entitled *Marihuana Under the Microscope* had been found in the jury room the day before, a day when the court was in recess and a civil trial was ongoing. The cover of the magazine depicted a marijuana plant magnified under a microscope. The cover also contained the title and a statement in smaller print that the magazine was a reprint of a DEA magazine. The magazine contained articles about various drug enforcement activities and about the adverse effects of marijuana use. It is undisputed that the magazine was anti-marijuana.

The judge stated that he had held the magazine up to the jury and asked whether any of them had seen it in the jury room. A couple of jurors answered that they had seen it. On relaying this information, the court sought advice from counsel on how to handle the situation. The court decided to conduct an inquiry with counsel present of each juror individually to determine whether any jurors had seen the magazine, and if

so, to what extent such jurors had read the magazine, and whether any jurors had seen other jurors look at the magazine.

The court proceeded to question each juror individually about his knowledge of the magazine. The court solicited questions from counsel and it was clear that counsel could have asked questions of the jurors at any time. Although a number of jurors stated that they saw the magazine in the room, almost all stated that they did not look at the magazine and that they did not see anyone else look at it. One juror stated that she picked up the magazine, looked at the cover and put it down. A couple of jurors stated that someone may have picked up the magazine but they were not sure.

The jurors' statements were overwhelmingly consistent. The only minor discrepancy in such statements was that one juror stated that she saw a "couple" of persons pick up the magazine and "rifle" through it, whereas only one juror stated that she picked up the magazine. The former juror also stated, however, that she did not know "that anyone really actually read [the magazine] or looked through it." Record, vol. 1, at 94.

After conducting the inquiry, the court denied all motions for a mistrial and stated:

> I watched the jurors carefully when I interrogated them and they were interrogated by counsel. Rather clearly someone commented in the jury room, "I wonder why on earth this is here?" and shows exceedingly good sense on their part. I'd like to know why it was there myself. However it was there, but I am satisfied after the interrogation that no juror read the contents of it or any of the articles and that at most somebody may have thumbed through it and it did not stick in their minds at all, such as would have resulted from having read it. And all of them indicated that it had no adverse effect on their impartiality.

*Id.* at 113–14.

Appellants assert that the court erred in denying the motions for a mistrial. We reject this assertion. Upon discovering the magazine in the jury room, the court had to conduct an inquiry to determine whether there was a "reasonable possibility that [the presence of the magazine in the room] was prejudicial to the defendant." *United States v. Howard*, 506 F.2d 865, 869 (5th Cir.1975); *see Paz v. United States*, 462 F.2d 740, 745 (5th Cir.1972). There is no magic formula that the trial court must follow in conducting this inquiry. Rather, it must use whatever inquisitorial tools are necessary and appropriate to determine whether there was a "reasonable possibility" of prejudice. The court did exactly that. After conducting the inquiry the court was convinced beyond a reasonable doubt that the presence of the magazine in the jury room would not affect the impartiality of the jurors. This court is left with a similar conviction after reading the record of the proceedings. The court conducted a thorough investigation, let counsel take part in the investigation, and reached the correct result only after carefully examining each juror. Thus, the court committed no error.

AFFIRMED.