15 F.3d 1093
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Guy L. LIONS, Defendant-Appellant.
 No. 91-50620.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 8, 1993.
Decided Jan. 18, 1994.
 
 1
 Before FLETCHER and D.W. NELSON, Circuit Judges, and HUBERT L. WILL,* Senior District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Lions appeals his convictions for conspiracy to possess methamphetamine with intent to distribute and possession of methamphetamine with intent to distribute (21 U.S.C. Secs. 841(a)(1) and 846; 18 U.S.C. Sec. 2). He was arrested at the conclusion of a Drug Enforcement Agency (DEA) sting operation, indicted on counts involving possession of methamphetamine with intent to distribute, and found guilty after a jury trial. He claims that the sting operation constituted outrageous government conduct, thus requiring dismissal of the indictment against him. He further claims that the prosecution's peremptory challenge of a black venire person during jury selection violated his right to equal protection. The district court denied his motions based on these two claims.
 
 
 4
 We have jurisdiction to hear his timely appeal pursuant to 28 U.S.C. Sec. 1291, and we affirm.
 
 FACTS
 1. The Sting
 
 5
 Guy Lions was arrested by DEA agents on November 15, 1991, and subsequently indicted on counts of conspiring to possess with intent to distribute, and aiding and abetting the possession with intent to distribute, six pounds of methamphetamine. After a jury trial, he was found guilty on both counts, and was sentenced on August 19, 1991 to 288 months imprisonment.
 
 
 6
 Lions' arrest was part of the culmination of a successful sting operation, orchestrated by the DEA through its confidential informant, Vincent Theis. Theis had been arrested in 1990 for attempting to purchase ten pounds of methamphetamine from a DEA agent, and pled guilty to a conspiracy charge. Hoping to get a reduced sentence, he agreed to help the DEA capture other dealers.
 
 
 7
 Theis had known one Sabrina Williams ("Sam") at least since 1987, and had engaged in methamphetamine transactions with her in the period between 1987 and his arrest in 1990. Lions' first contact with Theis was through Sam: Theis and Sam were in a motel room in Carlsbad, California when Lions called to talk to Sam. Theis testified that Sam talked to Lions for some time, and then handed the phone to him, saying "Guy wants to talk to you." RT, III, at 107. Theis claimed that Lions related to him his anger over a methamphetamine deal in which he had been "ripped off," and said he was "going to get" the responsible person.
 
 
 8
 DEA agents directed Theis to go to New Orleans in July, 1990, with a "recipe" for manufacturing methamphetamine. His goal was to interest several persons there in joining a methamphetamine production operation. During his stay in New Orleans, Theis made several calls to Lions in an effort to set up a meeting with him. Lions eventually came to meet with Theis. Theis told him he had a recipe for methamphetamine, and knew someone who would "cook" it for them. Theis testified that Lions was "very eager" to participate, and that Lions told him he could get the required glassware through a friend. RT, III, 108.
 
 
 9
 This particular plan, however, never developed any further. Lions' next contact with Theis was two months later: Theis telephoned him on September 26, 1990.[1] Theis first raised the subject of drugs: "maybe we can do business." Appellee's Supplemental Excerpts of Record (SER) at 1. Lions was not reluctant: "You got something now?" Theis mentioned he had "something in the works"--a possible sale involving 5 to 10 pounds of methamphetamine. Later in the conversation Lions said "I wish something were out there right now. So we could do some business." SER at 2. He closed the call with "give me a holler if something else blows in quick." SER at 4.
 
 
 10
 On October 24, 1990, Theis called Lions again. This time, Lions initiated the "business" side of their conversation: "you got anything?" SER at 6. Theis said that he had a friend who would be selling methamphetamine, but only if the purchaser bought at least 10 pounds. Lions expressed doubt that he had sufficient funds to purchase this large an amount.
 
 
 11
 The next day, Sam called Theis because "Guy told me to call you back." SER at 8. Referring to Theis' offer to sell 10 pounds of methamphetamine, she said Guy had instructed her "to see if you guys could go half now and half in three weeks and then [Guy] would do it."
 
 
 12
 On November 4, Sam again called Theis at Lions' request. They discussed the half-now, half-later plan for purchasing 10 pounds of methamphetamine. They also discussed a possible scenario for the transaction, in which Lions would send Sam and one other person to bring Theis the money. About 30 minutes later, Theis called Lions. They discussed several details of the proposed drug transaction, such as whether Sam would be a trustworthy courier. Lions assured Theis he would send her with a locked bag of money, and separately mail the key to Theis. Lions also asked Theis if he could "front" him $20,000 worth of the drugs, or about four of the ten pounds.
 
 
 13
 On November 5, Theis called Lions. Theis agreed to sell Lions six pounds of methamphetamine at $5000 per pound, if Lions would promise to buy four more pounds within the next month. Lions took Theis' address and agreed to send him the key to the locked bag in which Sam would bring the money.
 
 
 14
 On November 8, Theis called Lions in response to a page from Lions or Sam. Lions told Theis he would not be sending the money in a locked bag; instead, Sam and another person (Bourgeois) would each bring half.
 
 
 15
 On November 14, Sam, Bourgeois, and an accomplice (DeLaneuville) flew under assumed names to San Diego to carry out the transaction. The party rented two rooms at the Comfort Inn Motel. They contacted Theis and told him they were ready for the deal, although they were $1000 short. He assured them this was no problem, and arranged to meet them about two hours later.
 
 
 16
 Theis arrived with his "girlfriend," DEA special agent Lois Delaney. After some discussion, Sam agreed to let Theis count the money. $29,000 was there. Agent Delaney went to their car and brought a backpack containing six pounds of methamphetamine. While Theis weighed the methamphetamine for them, Sam, Bourgeois, and DeLaneuville examined it.
 
 
 17
 On a prearranged signal from Delaney, DEA officers entered the room and arrested Sam, Bourgeois, and DeLaneuville. Along with the drugs and cash, they seized from Bourgeois two of Lions' credit cards and his selective service card.
 
 
 18
 Following the arrest, Theis--still under cover--called Lions and told him "everything went okay," except that Sam and the others had been $1000 short. Lions promised to send Theis $1000 by the next day, and to buy another four pounds of methamphetamine within the month. Lions was arrested by DEA agents on the following day.
 
 2. Jury Selection
 
 19
 At jury selection, the court and the parties were presented with a 28-person venire and a 4-person alternate pool. Two persons out of this group of 32 were black.[2] The government used one of its six peremptory challenges to strike one of the black venire persons, Linda Reid. The other black venire person, Carl Hillman, was seated on the jury. Lions is white.
 
 
 20
 As part of the voir dire, the court and counsel conducted twelve confidential interviews of venire persons who had indicated that either they or a friend or family member had had some involvement with substance abuse. Both Reid and Hillman were in this group. Reid stated that her stepbrother had overdosed on heroin, and that her older sister had taken drugs, and had just been released from prison--where she had been serving time on a drug charge. After the interviews were concluded, the government exercised its peremptory challenges, striking, in addition to Reid, three other venire persons with backgrounds of substance abuse. SER at 63 (jury roster); SER at 65-68, 74-76, 80-81 (interviews of excluded venire persons).
 
 
 21
 Defense counsel objected to the exclusion of Reid, arguing, under Batson v. Kentucky, 476 U.S. 79 (1986), that the government had violated his right to equal protection by using its peremptory challenges in a racially discriminatory manner. The government responded that the problems with substance abuse in Reid's family might lead her to sympathize unduly with the defendant, and that since she was a vocational nurse, a member of a "helping profession," she might also tend to empathize rather than weighing the facts presented to her. The prosecutor stated that he had not stricken her on the basis of her race.
 
 
 22
 The court then asked the prosecutor to state his reasons for not striking white venire persons with backgrounds of substance abuse. The prosecutor supplied various explanations, such as the remote or experimental nature of the drug use at issue, or the convincing nature of a venire person's statement that he or she could be impartial. The prosecutor also explained that he could not strike every venire person with drug abuse in his or her background, because there were twelve such venire persons and he had only six peremptory challenges.
 
 
 23
 After further discussion with counsel, the court stated its findings:
 
 
 24
 The government has provided two clear and distinct reasons to strike this juror which I find to be appropriate. ... first of all, she had a death, it appears, or at least a serious O.D. on drugs, in her family; that, in itself, would not have been enough, I think, given the fact that there were other jurors here who had also drug-based problems in their family or personal history.
 
 
 25
 But on top of it, she also had a sister who had a serious drug problem, was convicted of that--of an offense for that. She may have been the only juror on the panel with that history. I think she is....
 
 
 26
 So she had a triple whammy. She had a combination that no other juror on the panel had, in addition to which counsel felt that as a nurse, she had this other--this kind of a helping profession. Again, that excuse, by itself, would not hold water, but when taken in consideration with the others, and my own observation of her response, which I clearly--she had a clearly pained and somewhat equivocal look on her face when she responded....
 
 
 27
 I find that there is no basis for a finding that the exclusion of this juror violates the equal protection arguments that have been raised in Batson and Holland; that there does not appear to be any racially based motivation for exclusion of the juror, in my view. SER at 119-120.
 
 DISCUSSION
 1. Outrageous Government Conduct
 
 28
 Lions appeals the district court's denial of his motion to dismiss on the basis of outrageous government conduct. We review the district court's legal conclusions de novo. United States v. Smith, 924 F.2d 889, 897 (9th Cir.1991). Where the district court's holding is based upon specific factual findings, it is reviewed for clear error. United States v. Emmert, 829 F.2d 805, 810-11 (9th Cir.1987).[3]
 
 
 29
 Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment was so shocking to due process values that the indictment must be dismissed. United States v. Hampton, 425 U.S. 484 (1976); United States v. Russell, 411 U.S. 423, 431-32 (1973); see Donald A. Dripps, "At the Borders of the Fourth Amendment: Why a Real Due Process Test Should Replace the Outrageous Government Conduct Defense," 1993 Univ.Ill.L.R. 261. It complements the entrapment defense in that entrapment focuses on the defendant's subjective intentions, while outrageous conduct focuses on the objective behavior of government agents. United States v. Garza-Juarez, 992 F.2d 896, 903 (9th Cir.1993). Under the "extremely high standard" of this doctrine, an indictment should be dismissed "only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." Id. (quoting United States v. Ramirez, 710 F.2d 535, 539 (9th Cir.1983) and Smith, 924 F.2d at 897).
 
 
 30
 In Bogart, this court wrote that outrageous conduct will be found where "government agents engineer and direct the criminal enterprise from start to finish," or where government conduct constitutes "the generation by police of new crimes merely for the sake of pressing criminal charges." 783 F.2d at 1436 (quoting Ramirez, 710 F.2d at 539, 540). In sum, an indictment should be dismissed only if
 
 
 31
 the crime is fabricated entirely by the police to secure the defendant's conviction rather than to protect the public from the defendant's continuing criminal behavior.
 
 
 32
 Id. at 1438 (emphasis in original).
 
 
 33
 On the other hand, according to Bogart, courts refusing to find outrageous conduct all conclude that
 
 
 34
 the defendant was involved in a continuing series of similar crimes, or that the charged criminal enterprise was already in progress at the time the government agent became involved.
 
 
 35
 Id. at 1437. Where the government was not the sole "creative inspiration" for the illegal transaction, United States v. So, 755 F.2d 1350, 1353 (9th Cir.1985), there is no basis for a finding of outrageous conduct.
 
 
 36
 This court has only once found government conduct sufficiently outrageous to warrant dismissal of an indictment. In United States v. Greene, 454 F.2d 783 (9th Cir.1971), the government was involved for over two years in the operation of defendants' illegal still. An undercover government agent initially contacted defendants and offered to supply materials and an operator for the still, and eventually did supply sugar for its operation. The government agent was the sole purchaser of the still's product. The court found that the duration of the operation, the government's substantial involvement, and the fact it was the sole customer worked together to make a case of outrageous conduct. The court said,
 
 
 37
 We do not believe the government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators.
 
 
 38
 Id. at 787.
 
 
 39
 The district court in United States v. Batres-Santolino, 521 F.Supp. 744 (N.D.Cal.1981), also dismissed an indictment because of outrageous government conduct.[4] There, a DEA informant led defendants into purchasing cocaine from another DEA agent, purportedly for importation into the United States. When at one point defendants expressed second thoughts about the deal, the agent talked them back into it. He also lured them with promises of further, extremely profitable deals. The court found that the two defendants were "amateurs" who had no criminal records, no experience, had never imported cocaine before, and could never "have entered the secretive world of international drug smuggling on their own." Id. at 751. The court found itself presented with "a case where the government, through its agent, went about putting persons into the business of crime for the first time." Id. at 752.
 
 
 40
 Finally, one other circuit has upheld the dismissal of an indictment on the basis of outrageous government conduct. In United States v. Twigg, 588 F.2d 373 (3d Cir.1978), a DEA informant suggested to defendant they start a "speed" laboratory. The DEA supplied about 20% of the needed glassware, and the indispensable chemical ingredient, P-2-P. The informant, not the defendant, purchased the other supplies and equipment. And the informant, not the defendant, supplied the necessary expertise and actually ran the lab. Finally, the government even provided an isolated farmhouse in which the laboratory could be set up. Ultimately, the DEA arrested defendant as he left the lab with the drugs he and the informant had produced. The Third Circuit found these facts to present a case of outrageous government conduct:
 
 
 41
 They set [defendant] up, encouraged him, provided the essential supplies and technical expertise, and when he and [the informant] encountered difficulties in consummating the crime, they assisted in finding solutions.
 
 
 42
 Id. at 381.
 
 
 43
 Lions first contends that Theis "generated and directed" the drug transaction which led to his arrest, analogizing his situation to that of the defendant in Greene. In Greene, however, the government was far more involved in the illegal activity: it supplied a raw ingredient of the moonshine over a two-year period, and it was the sole customer of the defendant's still. This conduct was outrageous because it constituted, "operat[ing], for an extended period of time, an actual and illegal apparatus," Luttrell, supra, 889 F.2d at 812, and it is thus clearly dissimilar to the DEA's conduct in Lions' case.
 
 
 44
 Nor does Lions' case resemble Batres-Santolino. There, the district court's finding of outrageous conduct was based on its belief that the government agent had taken "amateurs" with no criminal record and practically forced them "into the business of crime for the first time." In contrast, Theis did not have to twist Lions' arm. From their first call discussing a possible drug transaction, Lions was eager to participate. And at least in the world of methamphetamine transactions, Lions was no amateur--indeed he often spoke with Theis in a sort of "code."[5]
 
 
 45
 Lions' case is much more like United States v. Pemberton, 853 F.2d 730 (9th Cir.1988). There, an undercover agent was introduced to defendant through a third person. The agent said he was planning to smuggle a shipment of marijuana into the United States. Not needing to be prodded, defendant offered to help in exchange for a one-third share in the profits. Defendant and the agent subsequently negotiated several details of the proposed shipment, and defendant made arrangements in anticipation of his role (among other things, he bought scales and set up weighing tables in his garage). Defendant was eventually arrested and convicted of conspiracy to possess. In rejecting his claim that the government's conduct was outrageous, the court found that the government had merely "activated" rather than "engineered" defendant's illegal activity. Id. at 736. The court explained that "[f]ar from being an unwitting private citizen coerced into crime by an underhanded government operation, [defendant] is more akin to a practicing businessman who leaped at the chance to engage in another illicit transaction." Id.; see also United States v. Citro, 842 F.2d 1149, 1153 (9th Cir.) (no outrageous conduct where government agent suggested counterfeit credit card scheme to defendant, and supplied the fake credit cards, because defendant contributed his share to illegal transactions), cert. denied, 488 U.S. 866 (1988); Emmert, 829 F.2d at 813 (rejecting outrageous conduct claim because "the government was only on one side of the transaction: Powell and Emmert independently arranged the cocaine supply from codefendant Cioe. The government did not fabricate the crime in this case.").
 
 
 46
 Lions also argues that the DEA, through Theis, utilized unwarranted coercion in forcing him to buy more methamphetamine than he had planned to. Lions originally envisioned buying only one to two pounds, but Theis maintained his "supplier" would only deal at the level of five to ten pounds. Lions asserts that "Theis was pushing for the greater amount at the direction of the DEA." Id. at 18. The telephone calls between the two men reveal only that Theis stated his supplier wanted to sell ten pounds, and that Lions at first considered that a "problem." Without any further prodding, however, Lions called back the next day with a proposed half-now, half-later arrangement, a variation of which ultimately took place. This kind of ordinary, arms-length bargaining is not what the cases discussing "mental coercion" in the outrageous conduct context envision. See, e.g., Emmert, 829 F.2d at 811-12 (undercover agents' strong threats to defendants who expressed hesitation about a drug deal were "ordinary bargaining tactics in drug deals"; government conduct was therefore not outrageous).[6]
 
 
 47
 In conclusion, even viewing the facts in the light most favorable to Lions, the picture which emerges is one of equal and reciprocal "creative inspiration" in "fabricating" the methamphetamine sale. So, 755 F.2d at 1353; Bogart, 783 F.2d at 1438. From the recorded phone calls alone, it is apparent that Lions was eager to deal with Theis, and that he worked equally with him in determining the details of the transaction. Lions was clearly "in charge" of his codefendants, and made himself responsible for putting together the $29,000 which Sam and Bourgeois brought to San Diego. Because the DEA was on only one side of the transaction, and did not fabricate it out of whole cloth, the district court was correct to deny Lions' motion to dismiss the indictment against him.
 
 2. Jury Selection
 
 48
 Lions argues that the district court erred in finding that the government had legitimate, nondiscriminatory reasons for using a peremptory challenge to strike Reid. A district court's findings regarding purposeful discrimination in the jury selection process are reviewed for clear error. United States v. De Gross, 960 F.2d 1433, 1442 (9th Cir.1992) (en banc).[7]
 
 
 49
 In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court held that the racially discriminatory use of peremptory challenges violates the Equal Protection Clause. Although Batson listed as one of the requirements of a prima facie case of racial discrimination that the defendant be a member of the same racial group as the stricken jurors, 476 U.S. at 96, the Supreme Court has since held that a criminal defendant has standing to assert the equal protection rights of an improperly excluded juror whether or not the defendant belongs to the same racial group as the juror. Powers v. Ohio, 111 S.Ct. 1364 (1991).[8]
 
 
 50
 The burden of proof in a Batson challenge rests initially on the party asserting the challenge, who must make out a prima facie case by showing facts and circumstances from which an inference of racial discrimination may be drawn. Batson, 476 U.S. at 96. The burden then shifts to the opposing party to articulate a nondiscriminatory reason for excluding the venire person. Id. at 97-98. Where the trial court does not rule on the question of whether a prima facie case has been established, but simply requires the prosecutor to offer a race-neutral explanation, "the preliminary issue of whether the defendant has made a prima facie showing becomes moot." Hernandez v. New York, 111 S.Ct. 1859, 1866 (1991); United States v. Bishop, 959 F.2d 820, 824 (9th Cir.1992).
 
 
 51
 Thus the question here is whether the trial court committed clear error in concluding that the government provided credible, race-neutral explanations for its challenge. We hold that it did not. As the government pointed out, Reid's stepbrother had overdosed on drugs, and her sister had been addicted to drugs and had served time in prison on a drug felony charge. While other venire persons also had a history of drug abuse, nobody who remained on the jury divulged experiences of such apparent intensity: two very serious drug incidents with family members. Nor did the others testify to the same combination of factors that characterized Reid's case: serious drug experiences plus membership in a "helping profession." As a matter of arithmetic, moreover, the government simply could not have stricken all of the venire persons with substance abuse problems: there were twelve such persons, and the government had only had six challenges.
 
 
 52
 Appellant nevertheless suggests that Reid's drug problems were not as severe as those of two white venire persons who were 1 used drugs themselves, while Reid had not. However, Zwibel's and Gentry's experiences with drugs, although personal, were far more casual and remote than were Reid's: Zwibel had smoked marijuana three or four times 20 years ago, and had gotten sick, while Gentry had tried methamphetamine three or four times six years ago, and had not liked it. And although appellant states that there is nothing to indicate that Reid was still suffering any residual effects from her stepbrother's overdose (which had taken place eight years ago), the trial judge's observation of Reid's demeanor indicated that her family's experiences with drugs did still affect her--indeed, that they affected her in the most crucial way, since she appeared pained and equivocal when asked whether she could be impartial.
 
 
 53
 Given both this demeanor evidence and the other factors ably summarized by the trial judge, and given the trial judge's own clearly voiced concerns about racially discriminatory jury selection practices, we cannot find clear error here.
 
 
 54
 AFFIRMED.
 
 
 
 *
 Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The telephone calls described in the following pages were recorded and transcribed by the DEA
 
 
 [2]
 Although the record does not conclusively establish this fact, it is indicated in the government's brief and is not disputed by appellant
 
 
 [3]
 Where, as here, a judge has denied an outrageous conduct motion without making explicit factual findings, we have sometimes remanded for such findings. United States v. Luttrell, 889 F.2d 806, 814 (9th Cir.1989); United States v. Bogart, 783 F.2d 1428, 1433-34 (9th Cir.1986). That procedure is not necessary in this case, however, because here the relevant facts are not disputed. Bogart, 783 F.2d at 1434 (remand not necessary where "factual nature of government's conduct is not disputed" or is "very obvious or straightforward")
 
 
 [4]
 See also United States v. Marshank, 777 F.Supp. 1507 (N.D.Cal.1991) (dismissing indictment because of outrageous government conduct). Marshank, however, dealt with the prosecutor's use and manipulation of defendant's own attorney, and thus is of little relevance to Lions' situation
 
 
 [5]
 Lions referred, for instance, to Sam as a "horse" (one who only acts as a courier in drug transactions), and to one-pound amounts of methamphetamine as "pieces" or "stereos" (e.g., "I have enough cash for two stereos now")
 
 
 [6]
 We do not hold, however, that government conduct in inducing a defendant to purchase more of a controlled substance than he or she might otherwise have done can never constitute outrageous conduct. We are troubled that the DEA can effectively set the defendant's sentence by deciding how much of a controlled substance to offer to sell him or her. Where, as in Batres-Santolino, the government induced a defendant to purchase an amount that was clearly out of his or her league, such conduct might well require dismissal of the indictment
 
 
 [7]
 Appellant contends that the proper standard of review is de novo, and relies on the statement in De Gross that "[w]hether equal protection principles prohibit a party from peremptorily striking venire persons on the basis of gender is a question of law that we review de novo." 960 F.2d at 1436. That statement, however, referred to the purely legal question of whether Batson's prohibition of discriminatory use of peremptory challenges, which arose in the context of race discrimination, should also extend to cases of alleged gender discrimination. 960 F.2d at 1437-39. Even in De Gross itself, it was made clear that de novo review does not apply to the more routine and fact-based question of whether a peremptory challenge has been used in a discriminatory manner in a given case. 960 F.2d at 1442
 
 
 [8]
 Although Powers was decided three weeks before appellant's trial began, neither the attorneys nor the trial court appear to have been aware of it. The trial court nevertheless believed that a Batson challenge could be made by a defendant of a different race than the excluded juror, apparently on the basis of dicta in Holland v. Illinois, 493 U.S. 474 (1990), reh'g denied, 494 U.S. 1050 (1990)