**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony T. MULHERIN, Jr., Harvey E. Hornsby, Robert A. Holliday, Henry Mulherin, Elizabeth Moore, Defendants-Appellants.**

**No. 81–8025.**

United States Court of Appeals,
Eleventh Circuit.

July 28, 1983.

As Amended on Denial of Rehearing and Rehearing En Banc Nov. 21, 1983.

R. Jackson B. Smith, Jr., Augusta, Ga., for Anthony T. Mulherin, Jr.

Thomas W. Tucker, Dye, Miller, Tucker & Everitt, Augusta, Ga. (court-appointed), for Harvey E. Hornsby.

John B. Long, Nixon, Yow, Waller & Capers, Augusta, Ga. (court-appointed), for Robert A. Holliday.

G. Hughel Harrison, Samuel H. Harrison, Lawrenceville, Ga., for Henry Mulherin.

Percy J. Blount, Augusta, Ga., for Elizabeth Moore.

Bernard S. McLendon, Curtis Fallgatter, Asst. U.S. Attys., Jacksonville, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, KRAVITCH, Circuit Judge, and MORGAN, Senior Circuit Judge.

GODBOLD, Chief Judge:

Appellant Henry Mulherin was convicted of conspiracy to violate provisions of the National Firearms Act, 26 U.S.C. Sec. 5801

*et seq.*[1] Appellant Elizabeth Moore was convicted of conspiracy to distribute and to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. Sections 841(a)(1) and (b)(1)(B)(6). We affirm these convictions.

Appellants Tony Mulherin, Holliday, and Gene Hornsby were charged in the drug conspiracy and firearms conspiracy counts and with substantive violations of the National Firearms Act. These three alleged ringleaders asserted an entrapment defense. The jury found Hornsby and Holliday not guilty on the drug conspiracy count but was unable to reach a verdict as to Tony Mulherin on this count. On the firearms conspiracy count, the jury was unable to reach a verdict as to all three of these men. On the substantive firearms counts, the jury found the three not guilty on some counts and was unable to reach a verdict on others. We affirm the district court's determination that these three defendants may be retried on the mistried counts.

## I. The guns-for-drugs deal

In the early 1970's Gary Peacock of Miami and Robert Hayes, Gene Hornsby and Tony Mulherin, all from Augusta, Georgia, knew each other through their mutual interest in boat racing. In late 1980 Peacock, acting as an undercover operative for the Bureau of Alcohol, Tobacco and Firearms (ATF), telephoned Hayes in Augusta, informing Hayes that he was now a drug smuggler and gunrunner and asking Hayes to find him a source in Augusta for automatic weapons. Over the next few months Peacock repeatedly called Hayes to ask if Hayes had found him a gun source. Hayes was not helpful, but he mentioned Peacock's interest to their mutual friend Gene Hornsby. Once when Peacock called, Hornsby was in Hayes' store; Hornsby

talked with Peacock who asked Hornsby to find him a gun source. Hornsby, like Hayes, said he would ask around; but unlike Hayes,[2] Hornsby pursued the matter.

Hornsby located an automatic weapon through his friend Holliday. Peacock flew to Augusta with a business associate to meet with Hornsby and Holliday about the merchandise. Peacock paid Hornsby and Holliday $1,000 for the gun. Peacock wanted more guns; Hornsby and Holliday agreed to try to find more.

Soon thereafter Peacock invited Tony Mulherin into the scheme. At Peacock's suggestion, the scheme grew. The Augusta group acquired semi-automatic weapons and converted them to fully automatic operation. Friends and relatives were drawn in to manufacture silencers. Tony Mulherin's brother Henry became the group's source for dynamite and explosive devices.

Initially the deal was guns for cash, but Peacock suggested trading guns for marijuana and cocaine. Hornsby, Holliday and Tony Mulherin agreed. More people were needed, and Tony Mulherin introduced Moore into the group to act as drug tester and distributor. Clayton agreed to furnish a landing strip and storage place for the expected drugs.[3] The group made initial deliveries of guns, silencers and explosives, then a big trade of guns for drugs was set for April 5, 1981. Hornsby, Holliday and Tony Mulherin promised to fly about 20 machine guns and 300 silencers to an airstrip near Jacksonville, Florida. They arranged for Henry Mulherin to deliver about 1,000 pounds of dynamite plus blasting caps and detonation cord to Peacock's pilot at a site near Atlanta on the same day. In return, Peacock would fly in about 2,000 pounds of marijuana to Clayton's airstrip

---

1. The firearms charge included conspiracy to possess and transfer unregistered machine guns and silencers; to possess and transfer destructive devices and distribute explosive materials; to make machine guns, silencers, and unregistered firearms; and to possess firearms not identified by a serial number as prohibited by 26 U.S.C. Sections 5841, 5845, 5861(d), (e), (f), and (i), and 5871 and 18 U.S.C. Section 842(a)(3)(B).

2. Hayes was not implicated in the charges and testified at trial as a witness for the government.

3. Clayton was charged in the drug conspiracy and pleaded guilty.

near Augusta. They dubbed their plans "Operation Flying Circus."

During many hours of his dealings with the Augusta group Peacock was wired and their conversations were recorded. Business associates that Peacock introduced to the group were AFT agents and Drug Enforcement Administration (DEA) agents. On April 5 when Tony Mulherin and Hornsby landed in Florida with a planeload of machine guns and silencers they were arrested. Hornsby and Clayton were arrested waiting at the airstrip in Georgia to unload the expected drugs. Other participants were soon rounded up.

## II. The convicted appellants: Moore and Henry Mulherin

### a. Government misconduct

Moore and Henry Mulherin challenge the district court's refusal to dismiss the indictment for alleged government misconduct in investigating and prosecuting the case; i.e., there was no basis for Peacock's beginning the investigation since none of the defendants was suspected of criminal activity; appellants were unwary innocents seduced by Peacock into crimes so he could collect reward money; Peacock lied on the witness stand about paying his income taxes in previous years; an investigatory agent threatened a defense witness; and an agency witness lied about Peacock's financial incentives from the agency.

■ Government involvement in criminal schemes can be so outrageous that it offends due process. See U.S. v. Tobias, 662 F.2d 381 (5th Cir.1981) (Unit B), cert. denied, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982) [4]; see also Hampton v. U.S., 425 U.S. 484, 492–93, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); U.S. v. Russell, 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973).

To amount to a constitutional violation the law enforcement techniques must be so outrageous that they are fundamentally unfair and "'shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." U.S. v. Russell, 411 U.S. at 432, 93 S.Ct. at 1643 (quoting Kinsella v. U.S. ex rel. Singleton, 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)).

■ The government maintains these appellants have no standing to assert a due process violation based on alleged outrageous government conduct because neither Moore nor Henry Mulherin was first introduced into the scheme by a government agent. Because the conduct complained of here falls far short of a due process violation, we need not explore the question of standing to assert this defense. In Tobias, supra, the court rejected a claim of outrageous government conduct where the government suggested to the defendant that he manufacture the controlled substance PCP, provided him with the formula, chemicals, and equipment necessary for manufacturing PCP, and continued to give technical advice to him during the manufacturing process. While Peacock may have suggested the illegal activity here and given advice on converting weapons and manufacturing silencers, it was the defendants themselves who obtained the equipment and supplies for their activities. In U.S. v. Savage, 701 F.2d 867 (11th Cir.1983), a claim of outrageous government conduct was rejected where DEA agents posed as sellers of large quantities of marijuana, put the word out through undercover agents and confidential informants that marijuana was for sale, and arrested persons who bought marijuana from them once the sale was consummated. Here as in Savage

**4.** The Eleventh Circuit has adopted as its governing body of precedent the case law of the former Fifth Circuit handed down as of September 30, 1981, Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), and decisions rendered by the full en banc court of the former Fifth Circuit handed down after September 30, 1981, Banco Nacional de la Vivienda v. Cooper, 680 F.2d 727, 730 n. 3 (11th Cir.1982), and post-September 30, 1981, decisions of a "Unit B" panel of the former Fifth Circuit, Matter of International Horizons, Inc., 689 F.2d 996, 1004 n. 17 (11th Cir.1982). The case relied on above, U.S. v. Tobias, is a decision rendered by a Unit B panel of the former Fifth Circuit handed down November 30, 1981, and therefore is binding precedent in the Eleventh Circuit.

there was no reason for the government to suspect the particular defendants of criminal behavior at the outset of the undercover operation, and the confidential informants used, like Peacock, had a financial stake in netting as many people in the "sting" as they could. In *U.S. v. Struyf*, 701 F.2d 875 (11th Cir.1983), the contention of a due process violation was rejected where, in a *Savage* -type operation, the government informant solicited a close friend who was his former brother-in-law.

The assertions that Peacock and others lied about financial matters are based upon inconsistencies that were explored during trial. The jury had full opportunity to assess the conduct and credibility of the government's witnesses and also had overwhelming and essentially undisputed evidence of appellants' participation through some 50 hours of recorded conversations.

### b. Severance and joinder

Moore and Henry Mulherin contend the district court abused its discretion by denying their motions for severance. The district court may order severance where it determines prejudice will result from joinder, Fed.R.Crim.Proc. 14, but the decision to sever is in the discretion of the district judge, and will not be overturned in the absence of abuse of that discretion. *U.S. v. Riola*, 694 F.2d 670, 672 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1532, 75 L.Ed.2d 953 (1983). Appellants do not show an abuse.

Moore and Henry Mulherin maintain that they were prejudiced by Hornsby's, Holliday's, and Tony Mulherin's use of the entrapment defense. They argue that as minor actors they were prejudiced by a spillover of the evidence against Hornsby, Holliday and Tony Mulherin. They urge that the jury's verdict was inconsistent, showing an inability to compartmentalize the evidence against each defendant. Henry Mulherin also contends that the jury confused him with his brother Tony.

A codefendant's reliance on the entrapment defense does not of itself require severance for a defendant not asserting that defense. *U.S. v. Salomon*, 609 F.2d

1172, 1175 (5th Cir.1980). To require severance the defenses must be so antagonistic that they are mutually exclusive. *Id.* Here the use of the entrapment defense by codefendants added little to the government's case against Moore and Henry Mulherin. Appellants' participation was amply proved by the undercover tape recordings. The core defense used by Moore and Henry Mulherin was government misconduct in the investigation. This is akin to entrapment, not antagonistic.

As for overspill of evidence, appellants have not shown compelling prejudice. As in most joint trials, some participants were more involved than others. Inconsistent verdicts can stand if supported by the evidence. *See U.S. v. Ocanas*, 628 F.2d 353, 361 (5th Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981). The possibility of jury confusion over the complicity of the two Mulherin brothers was slight since they played vastly different roles in the enterprise.

### c. Sufficiency of the evidence

Moore and Henry Mulherin challenge the sufficiency of the evidence to support their convictions. In evaluating a sufficiency challenge we view the evidence presented and the inferences that may reasonably be drawn therefrom in the light most favorable to the government.

Applying the standards of *Glasser v. U.S.,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence is compelling that a conspiracy was afoot, that Moore knew of the conspiracy, and that she voluntarily became part of it. *See U.S. v. Lippner,* 676 F.2d 456, 466 (11th Cir.1982). Tony Mulherin told Peacock and Agent Gleffe that he would send a woman to the airport to meet them and inspect the quality of a sample of the expected cocaine. Moore appeared at the specified time and place and introduced herself as Tony Mulherin's friend. She told Gleffe that she and Tony had dealt together in cocaine and marijuana for some time. When shown bogus cocaine she inquired about the price.

She said she would report the results of her inspection to Tony Mulherin. Later Tony gave her marijuana to evaluate that he had received as a sample from Peacock. She was present during meetings between Peacock and the ringleaders where the scheme was discussed. She commented during a recorded meeting that she had previously been involved in a large marijuana deal. According to Tony Mulherin, Moore introduced him to a man named Layton who could price the expected cocaine for the group. The following notation appeared in Tony Mulherin's appointment book underneath what appeared to be a price list for drugs:

> Liz can get rid of 1 lb [pound] of coke [cocaine] in first week in Atlanta plus a few oz [ounces of cocaine] in Ags [Augusta] plus 1,000 ludes [quaaludes], plus 20–25 lbs [of marijuana.] Probably can double with Laytons help.

Government's exhibit 17–D. At Mulherin's direction Moore obtained various paraphernalia useful for cutting cocaine.

■ Moore contends, however, that because the same evidence was used to prove the firearms conspiracy as was used to prove the drug conspiracy, and the jury acquitted her on the former count, she must be acquitted on the drug conspiracy count. This misapprehends both the different elements of proof required under the two conspiracy statutes involved and the significance of a jury acquittal. While no overt act is required to prove a drug conspiracy under 21 U.S.C. Section 846, there is an overt act requirement under 18 U.S.C. Section 371, under which the firearms conspiracy was prosecuted. Criminal juries are free to render "not guilty" verdicts based on compromise, confusion, mistake, leniency, and a variety of other legally and logically irrelevant considerations. *U.S. v. Espinosa-Cerpa*, 630 F.2d 328, 332 (5th Cir. 1980). The relevant inquiry is whether the conviction Moore received is supported by the evidence. *See U.S. v. Ocanas*, 628 F.2d at 361. It is.

■ Moore also contends that she is entitled to judgment of acquittal or new trial because the jury found no one else guilty on the drug conspiracy count. *U.S. v. Sheikh*, 654 F.2d 1057 (5th Cir.1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *U.S. v. Musgrave*, 483 F.2d 327 (5th Cir.), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973). Not all other alleged co-conspirators were acquitted. There was a mistrial as to Tony Mulherin because the jury was unable to reach a verdict. The indictment alleged participation of unknown co-conspirators and known, but unnamed, co-conspirators. Clayton was named as a co-conspirator in the drug conspiracy count and not tried with Moore because he pleaded guilty. If the evidence supports the charge that Moore conspired with unknown persons, known but unnamed persons, or Clayton, her conviction will stand regardless of the disposition of the charges against the co-indictees with whom she was tried. *See U.S. v. Klein*, 560 F.2d 1236, 1242 (5th Cir.1977), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978); *U.S. v. Lance*, 536 F.2d 1065, 1068 (5th Cir.1976). As discussed above, there was evidence presented about a man named Layton whom Moore introduced to Tony Mulherin to price the expected cocaine. Viewing the evidence in the light most favorable to the government, the jury could have concluded that Moore and Layton, a known but unindicted person, conspired, or that Moore and Clayton, an admittedly guilty person, conspired.

Appellant Henry Mulherin's sufficiency challenge centers on his contention that he lacked the requisite knowledge of the nature of the scheme to have joined the conspiracy. Mulherin maintains the credible evidence showed that his brother Tony and the others deliberately kept him in the dark about the objectives of the conspiracy.

■ As to each alleged firearms conspirator the prosecution must prove that a conspiracy existed, that the defendant knew the essential objectives of that conspiracy, and that armed with that knowledge he participated, and must prove an overt act by one of the conspirators in furtherance of the conspiracy. *See U.S. v. Bankston*, 603

F.2d 528, 531 (5th Cir.1976). While mere presence or association with others involved in a criminal scheme is not sufficient to prove participation in a conspiracy, *U.S. v. Horton,* 646 F.2d 181, 185 (5th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981), the essential elements of a conspiracy can be proved by inference from the actions of the parties or by circumstantial evidence. *U.S. v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981). Direct evidence of an agreement to join a criminal conspiracy is rare, so a defendant's assent can be inferred from acts furthering the conspiracy's purpose. *U.S. v. Middlebrooks,* 618 F.2d 273 (5th Cir.), *modified on other grounds,* 624 F.2d 36, *cert. denied,* 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 247 (1980). The government is not required to prove that each alleged conspirator knew all the details of the conspiracy; it is enough to establish that a defendant knew the essentials of the conspiracy. *Alvarez,* 625 F.2d at 1198.

 We hold the evidence was sufficient to sustain Henry Mulherin's conviction. There was evidence that he was not to be told that Peacock was paying for the goods in marijuana and cocaine because he would not participate if he found out drugs were involved. But Henry was not charged in the drug conspiracy, only in the firearms conspiracy. In a sufficiency challenge it is his knowledge of only that conspiracy with which we are concerned. *Cf. U.S. v. Colson,* 662 F.2d 1389 (11th Cir.1981); *U.S. v. Rodriguez,* 585 F.2d 1234 (5th Cir.1978), *modified on other grounds,* 612 F.2d 906 (1980) (en banc), *aff'd sub nom. U.S. v. Albernaz,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *U.S. v. Ocanas,* 628 F.2d 353 (5th Cir.1980).

The evidence showed that Henry personally delivered some 300 pounds of dynamite plus blasting caps and detonation cord to Peacock and was prepared to personally deliver another 1,000 pounds when he was arrested. These deliveries were made at the direction of Tony Mulherin, who paid Henry more than five times as much as the goods would be worth in a legal sale. Henry also supplied Holliday and Hornsby with 300 pounds of dynamite, which they delivered to one of Peacock's supposed business associates. Henry was told that the dynamite was being sent to South America. He was concerned that the dynamite not be used in this country lest it be traced to him. He made delivery of the explosives in a secluded area. When the goods were delivered, all markings had been removed from the boxes. This is ample evidence from which the jury could infer that Henry knew the essential purposes of the firearms conspiracy and voluntarily undertook to participate in it. The district court did not err in refusing his motion for acquittal or in the alternative for a new trial.

d. Moore's remaining contentions

Moore's other issues may be disposed of briefly, some without comment.

She challenges the admissibility of an incriminating statement she made to an ATF agent shortly before her arrest:

> She [Moore] said that the police are everywhere in town. That a lot of people are getting arrested. She said they know everything, they even know the name Operation Flying Circus. She stated a location in Augusta, Georgia, that was the location where all of the cut and mixing bowls were.

Testimony of ATF Agent Penny, Supp.Rec. at 951. Moore contends she was in custody at the time the statement was made and should have been advised of her rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

 Moore and Peacock had arranged to meet at the airport on April 6, the day after the arrests in this case began. Agent Penny testified that when he and Agent Reese, whom Moore had met in his undercover pose as Peacock's pilot, came into the airport lobby, Moore approached them in an excited manner. She began rambling on about the recent arrests and blurted out the statement without being asked any questions. Then she was arrested.

Moore's statement was not the fruit of interrogation. It was admissible as a spontaneous, unsolicited statement.

 There is no merit to Moore's contention that the overt acts alleged against her in the indictment were insufficient. Under the drug conspiracy statute, 21 U.S.C. Section 846, an overt act is not required to be either alleged or proved. *U.S. v. Rodriguez,* 612 F.2d 906, 919 n. 37 (5th Cir.1980) (en banc), *aff'd sub nom. U.S. v. Albernaz,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

Her assertion that the statements made by her alleged co-conspirators against her were improperly admitted into evidence is also meritless.

### III. The mistried appellants: Hornsby, Holliday and Tony Mulherin

Appellants Hornsby, Holliday and Tony Mulherin seek to bar retrial of the mistried counts on various theories of double jeopardy. The district court denied their motions to dismiss but found their contentions not frivolous. We agree that the double jeopardy claims are not frivolous and find the district court's order appealable insofar as it concerns double jeopardy. *See U.S. v. Dunbar,* 611 F.2d 985 (5th Cir.) (en banc), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980).

#### a. Double jeopardy: one or two crimes

Hornsby and Holliday ask us to hold that double jeopardy bars their retrial on the firearms conspiracy count. They contend there was only one conspiracy, an agreement to trade firearms for drugs, that the jury made a determination on this one offense by finding them not guilty on the drug conspiracy count and thus retrial on the firearms conspiracy count would put them twice in jeopardy for the same offense. They rely primarily on *U.S. v. Marable,* 578 F.2d 151 (5th Cir.1978) and *Braverman v. U.S.,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). In both cases the court concluded that the one agreement involved could not be split into two conspiracy offenses. But in *Marable* the one agreement concerned cocaine and heroin and the government was trying to convict the defendants twice under the same statute— once for a heroin conspiracy and once for a cocaine conspiracy. In *Braverman* the separate counts charged conspiracy to violate different provisions of the internal revenue laws. Again the same conspiracy statute was being used twice by the prosecution.

Whether a single agreement can be treated as two offenses is a question of statutory interpretation. Where Congress intends to impose multiple punishment the double jeopardy clause is not violated by treating the single agreement as two offenses. As *Marable* states:

> [T]he statutes upon which prosecution rests distinguish this case from situations in which the defendant asserts a double jeopardy claim where the government has charged conspiracies under separate special conspiracy statutes. The Double Jeopardy Clause imposes few limits on the legislative power to define offenses.

578 F.2d at 154–55 n. 1.

Here the appellants were charged under two separate conspiracy statutes, the drug conspiracy under 21 U.S.C. 846 and the firearms conspiracy under 18 U.S.C. Section 371. In *Albernaz v. U.S.,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), the Supreme Court held that a single conspiratorial agreement violated both the statutory ban on conspiracy to import drugs and the ban on conspiracy to distribute drugs. The court concluded that the two counts were not the "same offense" for double jeopardy purposes. *Id.* at 344 n. 3, 101 S.Ct. at 1145 n. 3.

 The two statutes here contain even more differences; 21 U.S.C. Section 846 does not require proof of an overt act while 18 U.S.C. Section 371 does require proof of an overt act in furtherance of conspiracy. We conclude that Congress intended these statutes to define, prohibit, and punish two separate offenses, and thus retrial of appellants is not barred by the double jeopardy clause. *See Blockburger v. U.S.,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (if there is any difference in the elements to be proved, the two charges are not the same

offense). That much of the same evidence served "double duty" in proving the two offenses charged is of no consequence. *U.S. v. Pearson,* 667 F.2d 12, 15 (5th Cir.1982) (Unit B) (per curiam); *U.S. v. Cowart,* 595 F.2d 1023 (5th Cir.1979).

### b. Collateral estoppel and the entrapment defense

Hornsby, Holliday and Tony Mulherin maintain the government is collaterally estopped from contesting their claims of entrapment and thus retrial is barred. Their argument is that the jury, by finding them not guilty on some counts necessarily found them entrapped on those counts since no other defense was asserted; if they were entrapped as to one count they were entrapped as to the mistried counts.

▆▆▆ Collateral estoppel means that when an issue of ultimate fact has once been determined by a valid and final judgment the issue cannot again be litigated between the same parties in a future lawsuit. *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). In a criminal case it is "a protection embodied in the fifth amendment guarantee against double jeopardy." *U.S. v. Henry,* 661 F.2d 894, 897 (5th Cir.1981) (Unit B), *cert. denied,* 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982). The concept is distinct from double jeopardy in the sense that:

> [T]he traditional bar of double jeopardy prohibits the prosecution of the crime itself, whereas collateral estoppel, in a more modest fashion, simply forbids the government from relitigating certain facts in order to establish the fact of the crime.

*U.S. v. Mock,* 604 F.2d 341, 343–44 (5th Cir.1979).

▆▆▆ Collateral estoppel may affect a later criminal prosecution in two distinct ways:

> (1) it may completely bar a subsequent prosecution; or (2) although the subsequent prosecution may proceed, it may operate to bar the introduction or argumentation of certain facts necessarily established in a prior proceeding.

*U.S. v. Caucci,* 635 F.2d 441, 448 (5th Cir.) (Unit B), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981). We are concerned here only with the bar aspect.[5] The test of whether collateral estoppel bars later prosecution is whether the jury could not have rationally based its verdict on any other issue than the one the appellants seek to foreclose. *U.S. v. Lee,* 622 F.2d 787, 790 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981). That the jury may have based its verdict on this issue is not enough; appellants have the burden to show that the issue of entrapment was necessarily determined in their favor in the former trial. *See id.; U.S. v. Giarratano,* 622 F.2d 153, 155–56 (5th Cir. 1980).

Deciding whether collateral estoppel applies to the entrapment issue here requires that we examine the various counts, the testimony, and the jury's verdict to determine as best we can what makes the jury's verdict coherent. *See U.S. v. Larkin,* 605 F.2d 1360, 1369 (5th Cir.1979), *modified on rehearing,* 611 F.2d 585, *cert. denied,* 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 793 (1980). We should make this determination in a realistic, rational and practical way, bearing in mind all the circumstances. *Lee,* 622 F.2d at 790. The following chart outlines the charges against the three appellants and the judgments entered based on the verdicts returned by the jury.

---

**5.** We decline to consider whether any of the government's evidence related to the counts on which appellants were acquitted must be suppressed on retrial. *See U.S. v. Lee,* 622 F.2d 787, 791 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981) (question on the admissibility of evidence arising from application of collateral estoppel is not an appealable interlocutory order).

INDICTMENT 181–26 (Middle District of Florida)[6]

| Count | | Appellant | Verdict |
|---|---|---|---|
| 1. | Conspiracy to distribute and to possess with intent to distribute marijuana and cocaine | A. T. Mulherin<br>Hornsby<br>Holliday | Mistrial<br>Not guilty<br>Not guilty |
| 2. | Conspiracy to violate certain provisions of the National Firearms Act | A. T. Mulherin<br>Hornsby<br>Holliday | Mistrial<br>Mistrial<br>Mistrial |
| 3. | April 5, 1981 possession of approx. 16 unregistered machine guns | A. T. Mulherin<br>Hornsby | Mistrial<br>Mistrial |
| 4. | April 5, 1981 possession of approx. 16 machine guns not identified by serial number | A. T. Mulherin<br>Hornsby | Mistrial<br>Mistrial |
| 5. | April 5, 1981 possession of approx. 501 unregistered silencers. | A. T. Mulherin<br>Hornsby | Mistrial<br>Mistrial |

INDICTMENT 181–37 (Southern District of Georgia)

| Count | | Appellant | Verdict |
|---|---|---|---|
| 1. | Feb. 12, 1981 possession of one unregistered machine gun | Holliday<br>Hornsby | Not guilty<br>Not guilty |
| 2. | Feb. 12, 1981 transfer of one machine gun without written application | Holliday<br>Hornsby | Not guilty<br>Not guilty |
| 3. | Feb. 23, 1981 possession of 10 .22 calibre silencers | Holliday | Mistrial |
| 4. | Feb. 23, 1981 transfer of 10 .22 calibre silencers without written application | Holliday | Mistrial |
| 5. | March 14, 1981 possession of one unregistered machine gun | A. T. Mulherin<br>Hornsby<br>Holliday | Not guilty<br>Not guilty<br>Not guilty |
| 6. | March 14, 1981 transfer of one machine gun without written application | A. T. Mulherin<br>Hornsby<br>Holliday | Not guilty<br>Not guilty<br>Not guilty |
| 7. | March 14, 1981 possession of nine .22 calibre unregistered silencers | A. T. Mulherin<br>Hornsby<br>Holliday | Not guilty<br>Mistrial<br>Mistrial |
| 8. | March 14, 1981 transfer of nine .22 calibre silencers without written application | A. T. Mulherin<br>Hornsby<br>Holliday | Mistrial<br>Mistrial<br>Mistrial |
| 9. | March 28, 1981 possession of two unregistered aluminum silencers | A. T. Mulherin<br>Hornsby | Mistrial<br>Not guilty |
| 10. | Feb. [sic] 28, 1981 transfer of two aluminum silencers without written application | A. T. Mulherin<br>Hornsby | Mistrial<br>Not guilty |

---

On the conspiracy counts, a rational jury could have determined that Hornsby and Holliday were predisposed to engage in the firearms side of the deal but that the

---

**6.** See subsection d., below, exploring the Florida and Georgia indictments.

government failed to prove beyond a reasonable doubt that they were predisposed to engage in the drug side of the deal. Alternatively, a rational jury could have concluded that there was a reasonable doubt whether Hornsby and Holliday voluntarily agreed to the drug deal but did voluntarily enter the firearms deal.

The evidence showed that the deal initially made was firearms for money. Peacock had offered to trade drugs but Hornsby and Holliday preferred cash. Later Peacock told them he had cash problems and offered immediate payment in drugs or an indefinite wait for cash payment. Hornsby and Holliday had already invested time and money in the firearms deal; they could have concluded that having Tony Mulherin and his cohorts distribute the offered drugs was their only reasonable expectation of getting paid in the circumstances.

The evidence also showed that Hornsby and Holliday were not personally knowledgeable about drugs and drug trafficking. It was Tony Mulherin who said he knew people who could test and distribute the drugs and introduced those people into the scheme. It was Mulherin who kept books on the expected drug distribution and dispatched Moore with a shopping list for drug paraphernalia. Hornsby's and Holliday's passive roles in the drug side of the deal sharply contrast with their active participation in the firearms transactions.

Counts 1, 2, 5 and 6 of the Georgia indictment concerned the possession and transfer of M–2 rifles. Counts 7 and 8 concerned silencers delivered to Peacock and ATF agent Gleffe at the same time an M–2 was delivered. If, as appellants contend, the jury necessarily found them entrapped as to counts 5 and 6, it would be difficult to understand why the jury did not also find all appellants entrapped on counts 7 and 8. Our examination of the evidence reveals a more coherent explanation of the verdict.

The evidence showed that M–2's are World War II vintage guns. An M–2 can be produced from an M–1, a semi-automatic weapon, by installing a set of parts that are readily available in the marketplace.[7] Cross examination of the ATF's firearms expert focused on the basis of his opinion that the M–2's were in fact fully automatic

weapons. The expert had not actually test fired the M–2's to verify they were fully automatic, nor had he dismantled each to determine that it had all necessary parts installed to make it fully automatic rather than semi-automatic. Rather, he based his conclusion that the weapons were fully automatic on a visual examination of the weapons and their mechanical action. In view of the vintage of the weapons and the lack of evidence of higher reliability, a rational jury could have concluded that the government failed to prove beyond a reasonable doubt that these particular weapons were "firearms" within the meaning of the National Firearms Act. A rational jury could have found the expert's testimony about the operational characteristics of the counts 7 and 8 silencers more convincing since it was based on decibel measurements of sound reduction obtained by test firing weapons with and without the devices.

As for the jury's acquittal of Tony Mulherin on Count 7, a rational jury could have concluded that the government failed to prove beyond a reasonable doubt that Mulherin "possessed" the silencers involved but did aid or abet their transfer. On March 14, Mulherin drove Hornsby, Peacock, and Gleffe out to a fishing camp to test fire some weapons. They stopped on the way and Hornsby telephoned Holliday telling Holliday to bring the silencers out to the fishing camp. Mulherin knew the substance of the phone call. Holliday arrived at the camp with the silencers and gave them to Peacock and Gleffe. Peacock and Gleffe put the silencers in Mulherin's car and made a partial payment to Hornsby for the goods received. Afterwards Mulherin drove Peacock and Gleffe to the airport. Six days later Mulherin began financing Hornsby and Holliday's silencer production.

The silencers involved in counts 9 and 10 came from a different source. Hornsby and Holliday were making brass silencers. Tony Mulherin told Peacock and Gleffe he had a source who could make aluminum silencers. Hornsby was present during this conversation. Peacock and Gleffe indicated they were interested so Mulherin took them to see his silencer source. Hornsby went along with them. Peacock and Gleffe received two silencers from the source. No money was exchanged. A rational jury could have concluded that the government

---

7. Other weapons involved here were produced by filing down a bolt on semi-automatic weapons of a more recent vintage.

failed to prove beyond a reasonable doubt that Hornsby was more than a curious observer at this transaction.

We cannot conclude that the only rational basis for the verdict on any of the firearms counts was a finding that appellants were entrapped. The district court did not err in determining that collateral estoppel does not bar retrial of these appellants on the mistried counts.

### c. Government misconduct

 Appellants Hornsby, Holliday and Tony Mulherin also seek to bar retrial on double jeopardy grounds based on their assertions of prosecutorial misconduct and outrageous government conduct in the investigation. Double jeopardy does not bar their retrial. Any link between the alleged government is too attenuated to be more than mere speculation. Absent some cause and effect relationship between the court's declaration of mistrial and the alleged government misconduct, the general rule is that the genuine inability of a jury to agree on a verdict provides "manifest necessity" for a mistrial and reprosecution is not barred by double jeopardy. *U.S. v. Wright,* 622 F.2d 792, 794–95 (5th Cir.1980); *see U.S. v. Dinitz,* 424 U.S. 600 [96 S.Ct. 1075, 47 L.Ed.2d 267] (1976).

On retrial of these defendants the effect, if any, of alleged government misconduct or prosecutorial misconduct on their possible convictions on grounds other than double jeopardy is a matter for the district court to decide. *See Hart v. U.S.,* 565 F.2d 360 (5th Cir.1978); *Dupart v. U.S.,* 541 F.2d 1148 (5th Cir.1976).

### d. Vindictive prosecution; speedy trial

Appellants Hornsby, Holliday and Tony Mulherin were initially indicted in the Middle District of Florida with a drug conspiracy count, a firearms conspiracy count, and three substantive firearms counts. After they received a change of venue to the Southern District of Georgia, the government sought and obtained a second indictment from that district containing 11 more substantive firearms counts.[8] Appellants contend that the second indictment should be dismissed for failure to comply with the Speedy Trial Act, 18 U.S.C. Sec. 3161(b) and also because of prosecutorial vindictiveness.

Neither Hornsby, Holliday nor Tony Mulherin stands convicted of any crime and thus their appeals are interlocutory. *See U.S. v. Wilson,* 440 F.2d 1103, 1104 (5th Cir.1971), *cert. denied,* 404 U.S. 882, 92 S.Ct. 210, 30 L.Ed.2d 163 (1972) (in a criminal case final judgment means sentence; the sentence is the judgment); *Gilmore v. U.S.,* 264 F.2d 44 (5th Cir.), *cert. denied,* 359 U.S. 994, 79 S.Ct. 1126, 3 L.Ed.2d 982 (1959) (no immediate appeal where district court ordered a new trial since there was no sentence to be appealed).

The district court's order denying appellant's motions to dismiss the second indictment for government vindictiveness is not an appealable interlocutory order. *See U.S. v. Gregory,* 656 F.2d 1132, 1135 (5th Cir.1981) (Unit B) (a claim of prosecutorial vindictiveness does not seek to protect a right of such a special nature that it presents a compelling need for immediate review). To be reviewable the appellants must show that the charges in the second indictment were groundless and without any reasonable prospect of conviction. *Id.* at 1136. They have failed to do so. Appellants' speedy trial claims also are outside the scope of an interlocutory appeal. *See U.S. v. Stricklin,* 591 F.2d 1112 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979).

AFFIRMED.

---

**8.** One of these counts was dismissed during trial.